# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

ANTHONY R. BOYKINS,

    Plaintiff

v.

AMANDA ALRED, et. al.,

    Defendants

Case No.: 3:19-cv-00485-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF Nos. 1-2, 67

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Plaintiff's Motions for Temporary Restraining Order and/or Preliminary Injunction (TRO/PI). (ECF No. 1-2.) He has also filed a motion to consolidate the hearing on this motion with the trial on the merits. (ECF No. 67.)

After a thorough review, it is recommended that that Plaintiff's motions be denied.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC). On August 13, 2019, he filed an application to proceed in forma pauperis (IFP) and pro se civil rights complaint under 42 U.S.C. § 1983. (Compl., ECF No. 1, 1-1.) At the same time, he filed a motion for TRO/PI. (ECF No. 1-2.)

The motion states that medical treatment was recommended by University Medical Center (UMC) in Las Vegas, Nevada on or around March 4, 2018: that he see a neurologist within a week, and that he have a follow up CT scan for a lump on his throat within six months.

Throughout the briefing related to this issue, Plaintiff has called this a lump or mass on either his throat, neck, or cervical spine. The court will refer to this condition generally as a mass on his cervical spine. He raises this issue in reference to the radiographic findings from the cervical spine CT at UMC which were "potentially concerning for a metabolic or neoplastic process," which the court understands to mean a possible growth or tumor on the cervical spine.  (ECF No. 59-1 at 2 ¶ 4.a.)  Plaintiff asserts that over a year later, on March 25, 2019, he saw Dr. Ted Hanf, D.O., who referred Plaintiff to NDOC's Utilization Review Committee (URC). On April 15, 2019, Plaintiff was transported to William Bee Ririe Hospital (WBRH) for a CT scan of the cervical spine. He claims that the scan was interrupted by officers after Plaintiff complained about medical treatment at Ely State Prison (ESP). In his motion, he stated that was suffering because he did not know whether the mass on his neck was cancerous or indicative of malignant disease because the CT scan was not completed.

The motion also claims he has been denied medical treatment for a hernia in his groin area, which has become very painful. There is also brief mention of a lack of treatment for a finger injury, an assistive device being taken away, placement in a restraint chair, pain medication, lack of access to exercise or showers for a period of time, legal mail and a litany of other issues. The argument portion of the motion, however, appears directed at his claims that he has been denied recommended medical treatment relative to the mass on his cervical spine and for his hernia.

Plaintiff's indigency status had not yet (and still has not) been determined, and the complaint had not (and still has not) been screened under 28 U.S.C. §§ 1915, 1915A, to ascertain whether he states colorable claims for relief that may proceed against particular defendants; however, the court recognized the *potential* urgency of the medical issues raised in Plaintiff's

motion for TRO/PI, and determined the issues warranted expedited consideration. As discussed

above, the motion for TRO/PI raised a litany of issues, and to get a better grasp of which issues

Plaintiff was actually seeking emergent injunctive relief, the court ordered Plaintiff to submit a

supplemental  filing outlining the *critical* medical care that he claims is required. At the same

time, the court ordered the Nevada Attorney General's Office to advise the court whether it

would enter a limited notice of appearance on behalf of the Defendants for the purpose of

responding to the motion for TRO/PI, and if so, to file a response addressing Plaintiff's

immediate and/or urgent medical care issues (as identified in his supplemental filing) and file

under seal medical records *specifically relevant* to Plaintiff's claims. Plaintiff was permitted to

file a reply within 14 days of the filing of any response. (ECF No. 4.)

Plaintiff filed his supplemental affidavit on September 23, 2019, which discussed the

mass on his cervical spine and his request for the CT scan that was interrupted to be performed,

as well as treatment for his hernia. (ECF No. 5.)

Defendants entered their limited notice of appearance on September 26, 2019.

(ECF No. 6.) They filed their response to Plaintiff's motion for TRO/PI and supplemental

affidavit on October 14, 2019. They argue: Plaintiff cannot show he will experience irreparable

harm in the absence of injunctive relief; the reason the CT scan was interrupted was because of

his own behavior; and, his records do not support a worsening of his condition. In addition, they

argue that Plaintiff has not demonstrated he is likely to succeed on the merits of an Eighth

Amendment claim, and cannot show a balance of hardships weighs in his favor or that injunctive

relief is in the public interest. (ECF No. 7.) Nearly 100 pages of medical records, medical kites

(inmate request forms) and grievance documentation were filed under seal. (ECF Nos. 9, 9-1 to

9-4.) The response did not address whether Plaintiff had been scheduled for another CT scan. Nor did they address his contention that he was not receiving treatment for his hernia.

On November 18, 2019, the court ordered Defendants to file under seal the relevant medical records, kites, and grievances related to Plaintiff's claim he was not being treated for his hernia, and to give Plaintiff a reasonable opportunity to review all of these medical records. In addition, Defendants were ordered to file a declaration by a medical provider with knowledge of Plaintiff's condition and discuss the status of future treatment relative to the mass on his cervical spine and his hernia. The court advised it would then set the matter for a hearing where Defendants were to have the medical provider with knowledge of these issues present telephonically. (ECF No. 18.) The court set the matter for a hearing on December 13, 2019. (ECF No. 19.)

On December 5, 2019, Defendants filed the declaration ESP Director of Nursing Services I, Gloria Carpenter. She states that on April 15, 2019, Plaintiff was transported to WBRH for a CT scan, but it could not be completed due to Plaintiff being verbally abusive to officers and medical staff. After that, approval for another CT scan had to be obtained and the scan was performed on November 21, 2019. She also stated that Plaintiff was seen for his hernia on November 26, 2019, by nursing sick call, but refused a hernia belt. (ECF No. 27-1.) Defendants also filed 194 pages of medical records, medical kites and grievances under seal. (ECF No. 28-1.)

On December 13, 2019, the court held the hearing on Plaintiff's motion for injunctive relief regarding the mass on his cervical spine and his hernia. Nurse Gloria Carpenter was present telephonically. Deputy Attorneys General Olson and Rands were present in the courtroom on behalf of Defendants. The court adjourned the hearing because neither Nurse

Carpenter nor the Deputy Attorneys General were knowledgeable regarding Plaintiff's medical condition and treatment, despite specifically being ordered to be prepared to discuss these issues. In addition, Plaintiff had not been given access to the relevant medical records for the hearing as the court had ordered. (ECF Nos. 31, 32.) This unnecessarily wasted valuable time and effort by the court and court staff in preparing for and conducting the hearing, and the court had to request further briefing and set another hearing on this matter.

Following the adjourned hearing, the court issued a separate order directing Defendants to: file a declaration from Plaintiff's treating provider, Dr. Hanf, stating what treatment Plaintiff had received relative to the mass on his cervical spine and hernia, what the relevant diagnoses are, and what the future treatment plans are for each of these issues; to file under seal only the records relevant to these two issues; give Plaintiff a reasonable opportunity to review these records and Dr. Hanf's declaration in advance of the next hearing; make Dr. Hanf available to appear telephonically or in person for the hearing; make sure that Dr. Hanf as well as the Deputy Attorney General representing Defendants are knowledgeable about these issues and prepared to discuss them in detail at the hearing; and, ensure that Plaintiff has copies of the relevant records and documents to utilize and reference during the hearing. (ECF No. 32.)

On February 10, 2020, Defendants filed the declaration of Dr. Hanf (ECF No. 51-1) and the relevant records (ECF No. 51-2). Dr. Hanf's declaration merely incorporated by reference his recent "SOAPE Note" as well as the relevant medical records he relied on in performing his assessment of Plaintiff regarding these medical issues. (ECF No. 51-1.) Incorporating the records by reference was not particularly helpful since the SOAPE note does not contain an explanation in lay terms of the diagnoses, treatment received, or future treatment plans, as the court ordered.

The court scheduled another hearing for March 18, 2020, and ordered: that Dr. Hanf and the Deputy Attorney General be knowledgeable about the issues and be prepared to discuss them in detail; and, that Defendants ensure Plaintiff has copies of the relevant records and reports to utilize and reference during the hearing. (ECF No. 53.)

The court held the second hearing on March 18, 2018. Plaintiff claimed that he had been given only a limited amount of time to review the medical records attached to Defendants' latest submission and was not given a copy of the records to utilize during the hearing, as ordered by the court. Deputy Attorney General Olson advised that he had communicated with the assistant warden prior to the hearing and had requested that Plaintiff be provided with the records during the hearing. Then due to technical phone issues and difficulty hearing the participants in the hearing, the court continued the hearing to March 25, 2020. The court directed Dr. Hanf to submit a supplemental declaration to address the specific medical issues in lay terms. (ECF No. 57.)[1]

Dr. Hanf's supplemental declaration was filed on March 24, 2020. (ECF No. 59-1.)

The court held the continued hearing on March 25, 2020. The court heard from Dr. Hanf, defense counsel, and Plaintiff regarding his treatment, diagnoses, and any future treatment plans, and took the matter under submission. The court also directed defense counsel to file under seal kites Plaintiff said he had filed regarding his hernia since his last visit with Dr. Hanf.

---

[1] During the hearing, Plaintiff referenced a "no-kneel" order he claimed prison officials were ignoring, and the court asked Dr. Hanf to address the "no-kneel order" in his supplemental declaration. The "no-kneel" order is not the subject of the instant motion for TRO/PI; therefore, the court will not include a discussion about the "no-kneel" order. In short, Dr. Hanf states there has not been a "no-kneel" order in Plaintiff's medical record within the past two years and it is not medically indicated now. Plaintiff maintains that he had a "no-kneel" order when he was housed at HDSP. This issue will be addressed in connection with the filings where it is raised in due course.

(ECF No. 62.)

On March 30, 2020, Plaintiff filed a reply brief. (ECF No. 63.) The reply brief should be stricken for several reasons. First, in the September 11, 2019 order, the court permitted Plaintiff to file a reply brief within fourteen days of the date Defendants filed their response. (ECF No. 4 at 3.) The response was filed on November 4, 2019; therefore, Plaintiff's reply brief, filed almost five months later is untimely, and he did not seek leave of court to file a late reply brief. Second, the reply brief is 38 pages long, consisting of 35 pages of points and authorities and the remaining pages are an affidavit. Reply briefs filed in connection with a motion other than a motion for summary judgment are limited to **12 pages**. Local Rule 7-3(c) notes that motions to exceed page limits are disfavored, must be supported by a showing of good cause, and must be filed *before* the motion or brief is due. *Local* Rule 7-3(b). Plaintiff did not seek leave of court to file a brief in excess of 12 pages at any point, let alone before the reply brief was due. Third, much of the reply brief does not relate to the two issues that are the subject this request for injunctive relief. Plaintiff frequently files documents with the court that ignore the page number requirements, and he often inundates the court with filings that contain extraneous and irrelevant materials, as well as redundant filings. While the court will afford pro se inmate litigants a certain amount of latitude, "[p]ro se litigants must follow the same rules of procedure that govern other litigants." *King v. Atieyh*, 814 F.2d 565, 567 (9th Cir. 1987), *overruled on other grounds by Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012). Plaintiff's continued failure to adhere to the rules is affecting the court's ability to manage its docket and cannot be tolerated. In the future, Plaintiff is advised that a motion, other than a motion for summary judgment, is limited to 24 pages, exclusive of exhibits. Responses to motions are also limited to 24 pages, exclusive of exhibits. Replies are limited to 12 pages, exclusive of exhibits. LR 7-3(b).

1  Plaintiff also filed a motion to consolidate the hearing with the trial on the merits. (ECF

2  No. 67.) Given that his indigency status has still not been determined and his complaint has not

3  yet been screened, this motion should be denied.

4  On March 31, 2020, Defendants filed the hernia kites (referenced above) under seal.

5  (ECF No. 69-1.)

6  ## II. LEGAL STANDARD

7  The purpose of a preliminary injunction or temporary restraining order is to preserve the

8  status quo if the balance of equities so heavily favors the moving party that justice requires the

9  court to intervene to secure the positions until the merits of the action are ultimately determined.

10  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

11  Injunctions and temporary restraining orders are governed procedurally by Federal Rule of

12  Civil Procedure 65, but case law outlines the substantive requirements a party must satisfy to obtain

13  an injunction or restraining order. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund,*

14  *Inc.*, 527 U.S. 308, 319 (1999) ("[T]he general availability of injunctive relief [is] not altered by

15  [Rule 65] and depend[s] on traditional principles of equity jurisdiction.").

16  A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded

17  as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted). Instead, in every

18  case, the court "must balance the competing claims of injury and must consider the effect on each

19  party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense*

20  *Council, Inc.*, 555 U.S. 7, 23 (2008) (internal quotation marks and citation omitted). The instant

21  motion requires that the court determine whether Plaintiff has established the following: (1) he is

22  likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of

23  preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public

interest. *Id.* at 20 (citations omitted). ). The Ninth Circuit has held that "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are met." *Alliance for the Wild Rockies v. Cottress*, 632 F.3d 1127, 1132 (9th Cir. 2011) (internal quotation marks omitted).

The Prison Litigation Reform Act (PLRA) mandates that prisoner litigants must satisfy additional requirements when seeking preliminary injunctive relief against prison officials. The PLRA provides, in relevant part:

> Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief.

18 U.S.C. § 3626(a)(2). Thus, § 3626(a)(2) limits the court's power to grant preliminary injunctive relief to inmates. *See Gilmore v. People of the State of California*, 220 F.3d 987, 998 (9th Cir. 2000). "Section 3626(a)...operates simultaneously to restrict the equity jurisdiction of federal courts and to protect the bargaining power of prison administrators-no longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum." *Id.* at 999.

A temporary restraining order is appropriate when irreparable injury may occur before the court can hold a hearing on a motion for preliminary injunction. *See* 11A The Late Charles Alan Wright & Arthur R. Miller, et. al., *Federal Practice and Procedure*, § 2951 (3d ed. 1999). The standard for issuing a temporary restraining order is identical to the standard for a preliminary injunction. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001); *see also* 11A The Late Charles Alan Wright & Arthur R.

Miller, et. al., *Federal Practice and Procedure*, § 2951 (3d ed. 1999) ("When the opposing party actually receives notice of the application for a restraining order, the procedure that is followed does not differ functionally from that on an application for preliminary injunction and the proceeding is not subject to any special requirements."). A temporary restraining order "should be restricted to serving [its] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70,* 415 U.S. 423, 439 (1974).

### III. DISCUSSION

**A. Mass on the Cervical Spine**

**1. Summary of Evidence**

Plaintiff fell from the upper bunk while housed at High Desert State Prison (HDSP), and was transported to UMC via ambulance. (ECF No. 9-1 at 2.) He was admitted and discharged on March 4, 2018. He was diagnosed with incomplete paralysis. The follow up instructions state that he should follow up with neurology in one week. (ECF No. 9-1 at 5.) While at UMC, he had a CT scan of his cervical spine with and without contrast. The findings of the CT with contrast were: "1. Right paracentral disc osteophyte complex causing spinal canal narrowing and slight mass effect on the spinal cord at the C4-5 level. Correlate clinically for symptoms of cord compression. 2. Bilateral foraminal stenosis most prominent at C2-3 level. 3.6 mm lucent focus in the C6 vertebral bodies nonspecified. A follow up CT scan can be obtained in 6 months to evaluate stability." (ECF No. 9-1 at 17; ECF No. 52-1 at 8.) The findings of the CT without contrast state: "study is suboptimal secondary to motion; multilevel degenerative changes in cervical spine; no fracture or subluxation; 6mm focus of lucency in the C6 vertebral body is

nonspecific. After resolution of acute symptoms recommended follow-up with contrast-enhanced MRI of the cervical spine." (ECF No. 9-1 at 18.)

On March 6, 2018, medical staff at HDSP requested a neurology follow up per UMC's recommendation. (ECF No. 9-2 at 2.) On March 13, 2018, the URC response was to continue to monitor. (*Id*.)

Plaintiff sent a kite on November 28, 2018, asking when he would see a neurologist as was ordered by UMC on March 4, 2018. The response to the kite states that the neurology referral was submitted to the URC, but was not approved at that time. He was instructed to let medical know if he was currently having medical issues so he could be re-evaluated by a provider and a referral could be made, if appropriate. (ECF No. 9-3 at 2.)

On December 3, 2018, HDSP medical staff requested a referral to neurology from the URC, noting the fall and narrowing slight mass effect in the cervical spine. (ECF No. 9-2 at 3.) On December 7, 2018, he requested to see a neurologist per the UMC order. He was advised he had been scheduled. (ECF No. 9-3 at 3.) The referral was authorized on December 11, 2018, for Plaintiff to see Dr. Nagy at Nevada Brain and Spine on March 18, 2019. (*Id*.)

Plaintiff was transferred to ESP on January 4, 2019. (ECF No. 9-4 at 17.)

On January 9, 2019, Plaintiff asked when he was going to see the neurologist, pointing out that he was at ESP (when the neurologist was located in Las Vegas and he had previously been at HDSP). The response to his kite curiously states that the referral had not been authorized yet, even though records reflect that it was in fact authorized on December 11. (ECF No. 9-2 at 5.)

There is an HDSP medical transportation form sent on January 15, 2019, for Plaintiff to be transported from HDSP to Nevada Brain and Spine in *Las Vegas* for an appointment on

1  March 18, even though Plaintiff was already at *ESP* (ECF No. 9-2 at 4.) The neurology referral

2  form contains a notation that Plaintiff refusal on March 5, 2019 (well ahead of the March 18,

3  2019 appointment). There is also a notation on an HDSP medical transportation form that

4  Plaintiff refused on March 4, 2019 (again, well ahead of the March 18, 2019 appointment, and he

5  was still at ESP). (ECF No. 9-2 at 6.)

6      On March 25, 2019, Plaintiff sent a kite to Dr. Hanf at ESP asking when he would have

7  the test done regarding the mass on his cervical spine which had been recommended by UMC.

8  He was advised that a request had been sent to the URC. (ECF No. 9-3 at 6.) Plaintiff saw

9  Dr. Hanf, who noted that Plaintiff disputed that he refused the neurology consultation. Dr. Hanf

10  ordered a CT of the cervical spine. (ECF No. 9-4 at 14.) The referral request notes that the CT

11  scan was indicated following a traumatic fall and hospitalization at UMC in February of 2018,

12  and findings of a disc osteophyte complex causing spinal canal narrowing and slight mass effect

13  on the cord, stenosis, lucent focus in C6, non-specific. The referral form acknowledged that the

14  repeat CT had been recommended to occur within six months of the original CT; however, the

15  earlier referral was not approved by the URC. (ECF No. 9-2 at 7.) The subsequent referral was

16  approved by the URC on April 3, 2019. (*Id*.)

17      Plaintiff's medical records state that the CT of the cervical spine was scheduled for

18  April 15, 2019, at WBRH, but was terminated due to Plaintiff's behavior. (ECF No. 9-2 at 7; *see*

19  *also* ECF No. 2701 at 2 ¶ 5.) Plaintiff disputes this was the case, and contends that the officers'

20  conduct in interrupting his procedure was unwarranted and improper. (*See e.g.* ECF No. 9-3 at 7-

21  8, 9.)

22      Plaintiff submitted numerous kites following the cancelled procedure, between mid-April

23  and October of 2019, stating that he was concerned about the mass on his cervical spine and

whether it was malignant or benign and asking when it would be re-scheduled. (ECF No. 9-3 at 9 (April 18), 14 (April 24, 2019), 16 (April 26),  18-19 (April 30), 21 (May 6), 25, 27 (June 3), 28 (June 27), 29 (July 1), 30, 31-32, 34-36 (Aug. 17), 40, 42 (Aug. 19) , 50-51 (Sept. 12); ECF No. 28-1 at 192 (Sept. 7), 186 (Sept. 10), 180-181 (Sept. 12), 176-77 (Sept. 16), 170 (Sept. 17), 169 (Sept. 22), 161 (Oct. 13), 163 (Oct. 21). Some responses to his kites said he was scheduled to see a provider, while others said he refused to be seen, but in some kites Plaintiff disputes any refusal to be seen. On October 13, 2019, he reported difficulty swallowing and with balance and coordination. (ECF No. 28-1 at 161.) He was told he would see the provider. (ECF No. 28-1 at 163.) On October 21, 2019, a CT scan was ordered to follow up the abnormal CT scan from February of 2018, where the disc complex was causing narrowing with a mass effect. The referral form noted that this was a "re-submittal" that had previously been approved in April 2019. (ECF No. 28-1 at 94-95.) The referral was approved on October 30, 2019. (ECF No. 28-1 at 95.)

On November 18, 2019, Plaintiff sent a kite stating that he was scheduled to see Nevada Brain and Spine in March of 2019, and they said he refused, but he claimed he was never informed of the appointment. He asked for a biopsy and CT scan of the cervical spine. In response, he was told he would be taken to WBRH for the scan. (ECF No. 28-1 at 157.)

Plaintiff had the CT scan of the cervical spine on November 21, 2019. The cervical spine showed moderate degenerative changes, an osteolytic lesion in the inferior endplate of C-6, that was most likely a "Schmorl's node." (ECF No. 52-1 at 4.) The CT of the neck showed *no abnormal contrast enhancing mass*. (ECF No. 52-1 at 6.) According to Dr. Hanf, the findings were "NOT consistent with an active metabolic/neoplastic process." (ECF No. 59-1 at 2 ¶ 4.a.)

After that, Plaintiff sent kites asking who he would see about the results of the CT.

1  (ECF No. 28-1 at 152.)

2       On November 26, 2019, he sent a kite asking when he would see Nevada Brain and Spine

3  and when he would know the results of the CT scan and whether the mass was malignant. The

4  response states that he refused to go to the appointment and would be scheduled to see the

5  provider for the results. (ECF No. 28-1 at 144.)

6       On February 4, 2020, it was noted that the neurosurgeon referral was approved and is

7  pending. (ECF No. 51-2 at 2.)

8       On March 2, 2020, he sent a kite asking when he would see the neurologist, and was

9  advised that his neurology appointment had been approved by the URC and was pending.

10   (ECF No. 69-1 at 9.)

11       **2. Analysis**

12       Dr. Hanf made clear in his supplemental declaration and at the most recent hearing that

13  the original CT in February of 2018 at UMC was "potentially concerning for a metabolic or

14  neoplastic process and it was recommended in the radiology report that a follow up CT be

15  obtained in 6 months to evaluate stability." (ECF No. 59-1 at 2 ¶ 4.a.) Dr. Hanf states that the

16  referral was made and ended up being delayed due to Plaintiff's behavior. (*Id.*) Hanf is

17  presumably referring to the incident on April 15, 2019; however, this was more than a year after

18  the initial CT, and after some seven months of sending kites asking about having the CT

19  performed. There has been no explanation for the initial delay. The CT procedure was eventually

20  scheduled for April 15, 2019, at WBRH, but was terminated. The circumstances regarding the

21  termination are disputed, but in any event, Plaintiff began sending kites asking when it would be

22  rescheduled and voicing concern about the mass on his cervical spine between April and October

23  of 2019. Finally, after he complained of trouble with balance and coordination the CT scan was

14

1   ordered on October 21, 2019, and approved by the URC on October 30, 2019. He had the scan

2   on November 21, 2019.

3       While there may be issues to address regarding the likelihood of success on the merits,

4   including: the delay in getting the CT scan scheduled after the original CT scan at UMC, and

5   then the delay in getting it rescheduled after the April 15, 2019 CT scan was terminated, the

6   failure to give him the results after the November 2019 CT scan, and whether there was any

7   damage as a result of the delays; the bottom line for purposes of the instant motion is that the

8   scan was performed on November 21, 2019, and demonstrated there is no abnormal contrast

9   enhancing mass.

10      Dr. Hanf elaborated at the hearing that the original CT scan showed both orthopedic

11  findings (i.e., the discogenic/stenotic findings) and non-orthopedic findings (i.e. the small focus

12  of lucency in the vertebrae). The CT scan in November 2019 showed that he still had the

13  orthopedic stenotic/discogenic issues identified in the original CT scan, for which he has been

14  referred to neurology, but the small focus of lucency in the vertebrae that the UMC radiologist

15  wanted to monitor was "non-contributory and static." In other words, to the extent Plaintiff

16  feared there was a tumor, the CT scan was negative in this regard. Dr. Hanf says Plaintiff does

17  not need any follow up examination or treatment insofar as that issue is concerned. Dr. Hanf also

18  assured the court that he would set up an appointment with Plaintiff to go over the results of the

19  CT scan (though they were also discussed in detail for Plaintiff during the hearing).

20      Therefore, insofar as Plaintiff sought to have the CT performed and have treatment for

21  the mass in this cervical spine, his request for injunctive relief appears to be moot. The court

22  cannot conclude that he is likely to suffer irreparable injury in the absence of relief. Nor does the

23

1  balance of hardships weigh in his favor at this point. Finally, injunctive relief would not be in the

2  public interest as the scan was conducted and the results were negative.

3  The court did not construe Plaintiff's motion as encompassing the referral to the

4  neurosurgeon that was recommended by UMC because he was focused on the mass on his

5  cervical spine; however, to the extent that was Plaintiff's intent, injunctive relief is not warranted

6  in that regard either. Again, the were undoubtedly delays in referring Plaintiff to a neurosurgeon,

7  and some factual issues about why he never had the initial appointment. As of this time,

8  however, the court has a declaration from Dr. Hanf that the referral has been made and approved

9  and is pending. Dr. Hanf stated at the hearing that this is not a clinical scenario that makes it an

10  emergent referral. The court notes that we are currently in the midst of a global pandemic related

11  to COVID-19, a disease caused by the novel coronavirus, and so there may be significant delays

12  in Plaintiff seeing the neurosurgeon for a variety of reasons related to the pandemic. Even before

13  the pandemic, getting in to see a specialist could take many months, whether or not a person is

14  incarcerated. Lockdowns and other precautions being taken within the prison system to try and

15  prevent or slow the spread of the virus, as well as social distancing measures and directives

16  regarding non-essential business and guidance regarding the performance of elective medical

17  services during the pandemic will surely compound these wait times.

18  **B. Hernia**

19  **1. Summary of Evidence**

20  The first mention of a hernia in Plaintiff's records is in a progress note from April 12,

21  2019, indicating Plaintiff had an inguinal hernia in the left groin area.[2] He asked for stronger

22

23  _____

[2] There is also a hiatal hernia noted in his records from UMC, but this is a separate medical issue that is not the subject of this action.

pain medication, such as morphine. He was referred to the medical provider for this kind of medication. (ECF No. 9-4 at 11.) Plaintiff sent a kite to Dr. Hanf on April 20, 2019, asking when he would see a provider for his hernia. He states that he was escorted to medical on April 19, 2019, and they refused to see him. In response he was told that a failure to identify himself would be treated as a refusal to be evaluated by staff, and that he was rescheduled. (ECF No. 9-3 at 10.) He sent several more kites in April and May asking when he would be seen for his hernia, with responses stating that he had refused to be seen. (ECF No. 9-3 at 13, 16, 18-20, 24.) He sent a kite on June 3, 2019, complaining that his hernia was getting "twisted," and he was told he was scheduled to see the provider. (ECF No. 9-3 at 27.)

He several kites on August 17, 2019, requesting to be seen for his hernia, stating that it was causing him considerable pain and asked for stronger pain medications. (ECF No. 9-3 at 31-32, 34-36.) On August 19, 2019, he asked when he would be referred for surgery for his hernia and was told he had refused to be seen multiple times. (ECF No. 9-3 at 42.) He asked on September 16, 22, and 25, 2019, if he was going to be treated for his hernia. (ECF No. 28-1 at 166, 168, 176.) He was told he was scheduled to be seen by the provider on September 24, 2019, and he refused. (ECF No. 28-1 at 168.) He next complained about the hernia on November 24, 2019. The response to that kite states that he was seen on November 26, 2019. (ECF No. 28-1 at 146.) Per the medical notes, the left inguinal hernia was examined on November 26, 2019. It was soft, and Plaintiff reported it was tender. He had no guarding, and no dysuria or problems with urination, and no pain with bowel movements. (ECF No. 28-1 at 125.) A hernia belt was ordered that same day. (ECF No. 28-1 at 79.)

On February 4, 2020, when he saw Dr. Hanf, Plaintiff again asked for treatment of the hernia. Dr. Hanf's notes acknowledge that Plaintiff first reported the hernia in April of 2019.

Dr. Hanf indicated there was a gradual increase in size and pain, but no change in bowel movements. It measured 6cm x 4cm, and was soft and reducible. Plaintiff had pain with local examination. The plan was to continue with the hernia belt. Plaintiff was educated about NDOC policy regarding uncomplicated inguinal hernias. Dr. Hanf stated that he would place a general surgery referral to the URC. He advised Plaintiff to avoid direct stressors to the area. (ECF No. 51-2 at 2.)

Plaintiff sent a kite on March 2, 2020, asking to have his hernia treated, and he was advised in response that a surgery consult referral had been placed with the URC for approval. (ECF No. 69-1 at 9.)

According to Dr. Hanf, the surgery referral was presented to the URC and the decision was made to continue to monitor the hernia medically. (ECF No. 59-1 at 2-3 ¶ 4.b.)  The present treatment plan includes use of a hernia belt and avoiding exacerbating physical activities and the use of analgesics as prescribed for associated pain. The hernia will continue to be monitored, and if the clinical course dictates more aggressive treatment (i.e. surgery), then that will be addressed appropriately. (*Id.*)

**2. Analysis**

Plaintiff desires surgery for his left inguinal hernia, and Dr. Hanf and NDOC have decided to treated it conservatively at this time and will continue to medically monitor the condition. Dr. Hanf reiterated that NDOC's policy for uncomplicated inguinal hernias, which is being applied to Plaintiff at this time, is that the initial treatment is conservative: durable equipment to provide pressure to maintain the hernia (i.e., a hernia belt), analgesics as needed, and avoiding activities that cause pressure and exacerbate the hernia.

Dr. Hanf stated at the hearing that continued medical monitoring means that they will monitor the condition for decompensation or clinical changes. Dr. Hanf represented to the court that typically they rely on an inmate to raise complaints of change in condition to monitor, but assured the court he would set up an appointment with Plaintiff to facilitate this medical monitoring.

The court acknowledges there was a delay in addressing Plaintiff's hernia, between April and November of 2019; however, there are issues regarding whether Plaintiff refused treatment during that period of time, and what damage Plaintiff suffered as a result from the delay; however, the current course of treatment taken by Dr. Hanf and NDOC for Plaintiff's left inguinal hernia is medical monitoring. The question is whether injunctive relief requiring something further, i.e. surgery, is indicated.

In *Hamby v. Hammond*, 821 F.3d 1085 (9th Cir. 2016), inmate Hamby had an umbilical hernia—"a part of his intestine or abdominal fat had pushed through a weak spot in his abdominal wall, causing a bulge in his belly"[3]—which was "small" and "easily reducible" (meaning he could "push the hernia back into his abdomen by applying manual pressure or by lying down"). *Hamby,* 821 F.3d. at 1088. He was counseled on how to reduce it and was given a "rib belt designed to keep the hernia in." *Id*. He had some pain, tenderness and swelling, and was prescribed medication and advised to continue using the hernia belt. *Id*. He reported sharp pain while sleeping and using the bathroom and with sitting for long periods. He requested surgery on several occasions. Prison officials denied his requests, indicating that his condition would be monitored. There was evidence he could walk to get meals and use the bathroom. *Id*. The

---

[3] An inguinal hernia, such as Plaintiff has, "occurs in the groin area, when fatty or intestinal tissue pushes through a weak spot in the abdominal wall." *Id.* at 1098.

1 equivalent of the URC considered the request for surgery and denied the request, recommending

2 medical monitoring. *Id*. at 1088-89.

3          Hamby sued, asserting that the prison officials were deliberately indifferent to his serious

4 medical needs in violation of the Eighth Amendment. *Id*. at 1089. He also moved for a

5 preliminary injunction. The district court granted the motion and ordered referral to a surgeon to

6 evaluate for surgery, and to authorize surgery if so recommended. *Id*. Hamby was given his

7 surgery and the hernia was repaired. *Id*. He continued with his litigation for damages for the pain

8 he suffered as a result of the refusal to authorize the surgery. *Id.* The district court found that

9 prison officials were not deliberately indifferent, but even if they were, they were entitled to

10 qualified immunity. *Id*.

11          On appeal, Hamby argued that the medical monitoring course of treatment taken by

12 prison officials (before the district court ordered the surgery referral) "fell short of what the

13 Eighth Amendment requires." *Id*. at 1092. The Ninth Circuit pointed out, however,  that "Eighth

14 Amendment doctrine makes clear that '[a] difference of opinion between a physician and the

15 prisoner—or between medical professionals—concerning what medical care is appropriate does

16 not amount to deliberate indifference.'" *Id*. (quoting *Snow v. McDaniel*, 681 F.3d 978, 987 (9th

17 Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th

18 Cri. 2014) (en banc)). "Rather, '[t]o show deliberate indifference, the plaintiff 'must show that the

19 course of treatment the doctors chose was medically unacceptable under the circumstances' and

20 that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's

21 health.'" *Id*. "Deliberate indifference is a high legal standard. A showing of medical malpractice

22 or negligence is insufficient to establish a constitutional deprivation under the Eighth

23 Amendment." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

The Ninth Circuit affirmed the district court's decision that the prison officials were entitled to qualified immunity "because—to the extent they played any role in the decision to deny Hamby for surgery for his umbilical hernia—the record makes clear that they did so based on legitimate medical opinions that have often been held reasonable under the Eighth Amendment." *Id*. at 1093.

In *Hamby,* Dr. Hammond testified that "hernias 'typically' merit surgical treatment, but '[s]ometimes a condition can be monitored medically without treatment.'" *Id*. "'Medical evidence and experience,' he explained, 'show that some reducible hernias can be clinically monitored and surgical repair is not required. Under those circumstances, monitoring or 'watchful waiting' is medically appropriate. Watchful waiting is… medically acceptable for clinical management of both inguinal and umbilical hernias in many cases." *Id*. "Such monitoring can be done 'more or less intensively,' and will often involve behavior changes on the part of the patient and repeated examinations by medical personnel." *Id*. He stated that Hamby's surgery was declined because "there was no evidence that his hernia was incarcerated [irreducible] and [because] he was managing his activities of daily living." *Id*. Nor had he presented with "symptoms of intractable pain." Dr. Hammond concluded that while the hernia might cause "discomfort or pain from time-to-time" it could be "managed without surgical intervention." *Id*. Again, Hamby was monitored, given a hernia belt, medications and was educated on how to not exacerbate his pain. *Id*. Hamby presented expert testimony that medical monitoring "may be a reasonable alternative to surgery" for reducible hernias that do not cause significant symptoms, though it was his opinion that the benefits of surgery outweighed the risks of the procedure. *Id*. at 1093-94.

1    The Ninth Circuit noted many cases holding that there was no Eighth Amendment

2  violation when prison officials denied surgical treatment to an inmate with a reducible hernia. *Id*.

3  at 1094 (citing cases).

4    The factual background in *Hamby* closely mirrors that presented here: Plaintiff has a

5  hernia that has been described as small, soft and reducible. Plaintiff has complained of pain but

6  not intractable pain, and there is no evidence in the record about it impacting his activities of

7  daily living.

8    In addition, Dr. Hammond's testimony is similar to that offered by Dr. Hanf in this case:

9  that uncomplicated hernias may be conservatively treated with medical monitoring, a hernia belt,

10  medications, and education regarding not engaging in activities that exacerbated his pain.

11  Dr. Hanf assured the court at the hearing that he would evaluate Plaintiff and set up an

12  appointment to facilitate medical monitoring for changes in his condition that might warrant

13  referral for surgical repair.

14    In light of the similarities between this case and *Hamby,* the court cannot conclude at this

15  time that Plaintiff is likely to succeed on the merits, that he is likely to suffer irreparable harm in

16  the absence of injunctive relief, that the balance of hardships tips in his favor or that injunctive

17  relief is in the public interest.

18    If, however, the circumstances change, and medical monitoring does not occur despite

19  Dr. Hanf's representations to the court, and Plaintiff's pain becomes intractable and affects his

20  activities of daily living, his hernia is no longer reducible or grows to a size that is concerning,

21  and medical officials do not respond appropriately, Plaintiff may renew his request for injunctive

22  relief as to the hernia.

23

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order

(1) **STRIKING** Plaintiff's reply brief (ECF No. 63).

(2) **DENYING** Plaintiff's motion to consolidate the hearing with the trial on the merits (ECF No. 67) as his indigency status has not yet been determined, and his complaint has not been screened, so he does not even have an operative pleading on file and no defendants have been served.

(3) **DENYING** his motion for TRO/PI (ECF No. 1-2).

(4) Finding that this matter is now ready for screening.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: April 10, 2020

_____
William G. Cobb
United States Magistrate Judge